IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 11, 2025 Session

**STATE OF TENNESSEE v. DANIEL J. DREADEN**

**Appeal from the Circuit Court for Rutherford County**
**No. 85227    James A. Turner, Judge**

_____

**No. M2024-00429-CCA-R3-CD**

_____

The Rutherford County Grand Jury indicted Defendant, Daniel J. Dreaden, for three counts of rape. On the State's motion, the trial court dismissed Count 3. Defendant waived a jury trial, and following a bench trial, Defendant was convicted on the remaining two counts. The trial court sentenced Defendant to a total effective sentence of eight years, with ten months to serve and the balance to be supervised on probation. Defendant appeals his convictions, asserting 1) that his confrontation right was violated when the trial court prohibited him from cross-examining the victim, Defendant's then-wife, about her extra-marital affair to establish her motive for the allegations of rape; and 2) that the evidence was insufficient to establish that Defendant raped the victim. We affirm the judgments of the trial court, but remand for entry of a judgment form in Count 3 to reflect dismissal of that count.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JEFFREY USMAN, Sp. J., joined.

Patrick T. McNally (on appeal), Nashville, Tennessee; Joshua T. Crain (at trial), Murfreesboro, Tennessee, for the appellant, Daniel J. Dreaden.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Matthew Westmoreland, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Trial*

The victim, J.P.,[1] and Defendant were married in March of 2015. In September of 2019, J.P. told Defendant she wanted a divorce, and they separated. J.P. went to the marital home "most of the days" but spent "most nights" with friends or at "the base." She was in the National Guard and was a full-time college student, and she "didn't have money or any way out to go anywhere." By December of 2019, she was no longer living in the marital residence, but she spent the night there on the night the incident occurred "to wake up in the morning with the babies." She "put the babies to bed" and sat on the couch to watch television. Defendant sat beside her and tried to put her feet on his lap, but she pulled her feet away. Defendant asked J.P. if she "wanted to have sex with him." She answered, "[N]o, that we're getting a divorce."

J.P. took a Benadryl, "had a drink," and went to bed. She did not remember whether Defendant went to bed with her, but she testified, "I don't think so. We had talked before sometimes about him sleeping on the couch. But I don't remember that night." She testified, "[a]t some point during the night, I kind of remember waking up and pushing his arm off me. And I went to sleep and woke up in the morning." When she woke up, J.P. "could feel like [Defendant] had had sex with [her] while [she] was asleep." She went to the bathroom, and it was "pretty evident what happened." She confronted Defendant, and he "continued denying it all day, until that evening when he admitted what he had done." Defendant cried and apologized to her, stating "that he thought that if he could just do it, [J.P.] would love him again."

J.P. said it was not the first occasion and that it happened "often enough" that she confronted him about it and told him it made her "uncomfortable." She asked Defendant to stop, and Defendant said, "okay[,]" but "it never really stopped." Defendant told J.P. that she would sometimes "rub" or "grind" on him. She acknowledged that it was "possible" she did that, but she did not remember it. She told him to "move away" from her or to wake her up and tell her to stop if she did that.

J.P. eventually disclosed the incidents to two sergeants in her unit, who both encouraged her to go to the hospital and to the police, but she "wasn't ready" to. J.P. continued "to maintain [her] daily schedule of going to school and taking care of the babies[,]" but she tried not to stay overnight at the marital home unless her mother was also there. Defendant would "corner" her "all the time" to talk about the incidents. When J.P. told Defendant he raped her, he denied it was rape and said, "It was just something that he was trying to use to fix the relationship."

---

[1] It is the policy of this Court to refer to victims of sexual offenses by their initials to protect their identity.

On cross-examination, J.P. acknowledged that she went to the Smyrna Police Department to report that Defendant had raped her on the same day that Defendant filed a complaint for divorce against her, August 11, 2020, approximately eight months after the rapes occurred. Between September of 2019 and November of 2019, Defendant and J.P. attended two counselling sessions, and they engaged in family activities with their children. J.P. acknowledged she testified at a previous divorce hearing that it was possible she had "grinded" on Defendant the night of the incident but explained at trial, "I meant like after I had fallen asleep. I have no recollection of what I was doing when I was asleep. And that's just something he said happened."

Jessica Mitchell and her boyfriend Andrew Nowicki were friends with Defendant and J.P. One weekend a month while Defendant and J.P. had drill duty, Ms. Mitchell and Mr. Nowicki would watch their children. She testified that Defendant called her to admit that he had intercourse with J.P. while J.P. was sleeping. She said Defendant was "sobbing." Ms. Mitchell told Defendant that what he had done was "against consent" and "wrong." Defendant "seemed like he knew something wrong had happened," but he told Ms. Mitchell he "wanted [his] wife back, and that's why [he] did it." Ms. Mitchell recalled that Defendant told her about the incident sometime between December 16 and 19, 2019, because they "were supposed to double date to go see the Star Wars movie on the 19th. And that did not happen."

Mr. Nowicki recalled that Defendant called him the day after the incident and told him that he and J.P. "had been on the couch cuddling" the night before and that Defendant "asked [J.P.] if they could have sex, and she had said no." Defendant told Mr. Nowicki that he went into the bedroom while J.P. was asleep and "proceeded to penetrate her, and then realized what he was doing was inappropriate and stopped." Defendant seemed "fairly panicked." Mr. Nowicki had "several conversations" with Defendant about the incident, and Defendant never denied that J.P. had told Defendant she did not want to have sex or that she was "unconscious" when Defendant penetrated her. Text messages between Mr. Nowicki and Defendant on December 19 were admitted as exhibits. The messages read in part:

[Defendant]: Honestly we were fooling around on the couch and cuddling close. I never thought it was out of the question. And we snuggled really close in bed. And again I never thought it was out of the question. If I had known her stance on it, I should have been on the couch.

[Mr. Nowicki]: It is a matter of consent, dude. She told you that night no and was asleep.

- 3 -

[Defendant]: It is. I just thought she meant not right now, maybe later. It wasn't a harsh tone. Honestly, the position we were in always resulted in sex, and she was always happy about it. Circumstances change, and I thought things were getting better. I should have just slept on the couch.

Defendant also stated that he and J.P. had been "hard flirting" and "grinding on each other on the couch." Defendant said, "I wanted her to wake up and turn and kiss me." He said, "She was grinding into me, and I thought she was worked up. And I would wake her up, and we would fall into each other's arms and be man and wife."

Defendant testified that prior to J.P.'s announcing she wanted to separate in September of 2019, he had been away for "about a month" doing training exercises for the National Guard, and before that, J.P. had been in training for two weeks. Defendant was confused because he "was under the impression that [they] had a model marriage that [he] would brag to people." Between September and November of 2019, J.P. was away from the home more than she was there and it was "very sporadic." When she stayed at the marital home, they always slept in the same bed together.

For seven consecutive days prior to the date of the incident in December of 2019, J.P. had not been at the marital home. She was working late and "staying with a friend[.]" Defendant told her he "was taking care of everything, but [he] wanted her to come home." She returned on a Saturday, and they spent the day together with their children, building toy trains at Lowe's and choosing a Christmas tree. Defendant described it as "a good day." That night, while they watched television on the couch, J.P. put her feet on Defendant's lap. They each drank "maybe two" alcoholic drinks. When J.P. got up from the couch to go to bed, she "got up onto [Defendant's] lap and exaggeratingly grinded into" him. She looked at Defendant, and Defendant asked her if she wanted to have sex, to which she responded, "No." Defendant followed her to the bedroom, and they "snuggled up on the bed." Defendant said his "hand was between her breasts, and her butt was in [his] lap" and they were "spooning." J.P. did not object to Defendant's touching her. Defendant testified they had intercourse, that J.P. was awake, and that there was no point during the sexual encounter that he believed she did not consent. When asked whether J.P. was "unconscious," Defendant answered, "No, not to my knowledge."

The following day, J.P. asked Defendant if they had sex. Defendant was "caught . . . off guard" and denied that they had. J.P. continued to ask, and Defendant "told her what happened." J.P. told Defendant "that what [he] had done was rape." After the incident, J.P. stayed away from the marital residence most of the time but occasionally slept in the same bed with Defendant. Defendant remembered that on Christmas Eve, he "asked if he could drape [his] arm over her, put it on her stomach, and she said yes." They "cuddled that night as well." They also did activities together as a family during that time.

- 4 -

Defendant said, "it was situations like that and little kisses on the head along the way that led me to believe that we were going to work it out in the end[,]" although J.P. maintained that she wanted a divorce.

Defendant denied Ms. Mitchell's account of their phone conversation. He said Ms. Mitchell "took direct control of the conversation and started telling [him] what had happened." He believed that Ms. Mitchell had already spoken to J.P. Defendant explained his text messages to Mr. Nowicki, stating that J.P. was not asleep "to [his] knowledge at the time." He said, "When I was describing the moment to [Mr. Nowicki], I was describing how I wanted her to be more energetic, and I wanted the moment to be more passionate."

Defendant testified that J.P.'s consuming vodka and Benadryl had been "a nightly routine" for "[m]aybe a year." There were other occasions when they "had conversations in her sleep" and J.P made a sandwich that she had not remembered. Defendant said they had "had sex before, and she didn't have a memory of it" but that "[m]ore often she would [remember]."

After hearing all the proof, the trial court found that "this is a case that hinges on credibility." Considering the credibility of J.P., the court found that "there were aspects of [J.P.'s] testimony that the [c]ourt struggled with on a scale of credibility[;]" however, the court did not believe she was untruthful. The court also found that Defendant "could not be classified as the most credible witness" and that Defendant "may [as] well have admitted to perjury in this court based upon conflicting testimony in front of Judge Scarlett from the prior hearing in this case."

The court recited the facts about which Defendant's and the victim's "testimony agree[d]." The court found that on the night in question, "there was some mutual, consensual rubbing or grinding or affectionate touching"; that Defendant and J.P. consumed vodka; that "at some point [J.P.] said no to having sex"; "that there was sexual penetration"; and that Defendant denied having had intercourse the following morning but later admitted it. The court considered the victim's "delayed reporting" and the "multiple times where she was back home with [Defendant]."

The court characterized Ms. Mitchell and Mr. Nowicki as "reluctant witnesses." The court observed that they had "chosen a side" and that their testimony corroborated J.P.'s testimony. The court considered the text messages between Defendant and Mr. Nowicki and had "a difficult time accepting" Defendant's explanation.

The trial court found that the victim initially denied consent to sexual penetration and that later she was mentally incapacitated due to the consumption of vodka and Benadryl to a point where she could not render consent. The court concluded, "the proof

presented by the State achieves the burden of proof of beyond a reasonable doubt, and []
they have proven their case as to Counts 1 and 2 to the offense of rape." The trial court
merged Count 2 with Count 1 and, following a sentencing hearing, imposed a sentence of
eight years to be suspended to probation after serving ten months.

Defendant filed a timely motion for new trial, which the trial court denied after a
hearing. This timely appeal followed.

*Analysis*

Defendant contends the trial court violated Defendant's constitutional right of
confrontation by prohibiting Defendant from cross-examining J.P. about her extra-marital
affair to establish her motivation to fabricate the alleged rape. Defendant argues that the
trial court erred by excluding evidence of the "extra-marital affair under [Tennessee Rule
of Evidence] 412, finding that such proof would constitute inadmissible evidence of her
sexual behavior."

The State filed a motion in limine to exclude evidence of an alleged extramarital
affair by the victim pursuant to Tennessee Rules of Evidence 402, 403, 412, and 608. The
State sought "exclusion of testimony of prior sex acts between the victim and [D]efendant,
any allusion of an alleged affair of the victim, and any specific individual's opinion on the
evidence or strength of the case." Defendant filed a response to the State's motion arguing
that the motion was "overly broad and the granting of such request . . . would violate [his]
Fourteenth Amendment Due Process right to present a complete defense." Defendant's
response alleged that the State's motion sought to exclude findings from an electronically
signed Order, dated September 22, 2020, of the Rutherford County Chancery Court,
concerning Defendant and J.P.'s divorce ("Chancery Court Order").

Defendant likewise filed a motion to introduce specific instances of the victim's
sexual conduct pursuant to Tennessee Rule of Evidence 412. Defendant sought to
introduce evidence that J.P. had "engaged in consensual intercourse with the accused in the
same manner, and under the same circumstances as she alleges constitutes rape in
December 2019." Defendant's motion did not raise potential evidence of J.P's sexual
behavior with persons other than Defendant.

## The "412 Hearing"

The day before trial, the trial court held a hearing on the motions. The transcript of
the hearing indicates a "412 Hearing was Conducted and Separate Transcript Sealed Per

- 6 -

Court Order." No such sealed transcript appears in the record on appeal.[2] The transcript then picks back up with the trial court's commenting, "we'll reopen our court to the public."

The trial court then asked, "is there any proof associated with the allegations of an affair that the parties would like to proffer . . . for the [c]ourt to determine the admissibility of it, or is there a stipulation - - or you tell me." No such proof or stipulation was offered or proffered by any party. Defense counsel stated, "no proof as it would relate to 412. What I would simply state to the [c]ourt is that it is not the intent of the [d]efense in this case to raise specific instances of sexual conduct of [J.P.] with anyone else."

A discussion then arose between defense counsel and the trial court regarding allegations of an extramarital affair, with the trial court stating that such is inadmissible evidence to "impeach or discredit a witness's testimony" for "impeachment purposes." Defense counsel concurred that evidence of an affair could not be used to attack the victim's credibility but asserted, "that is distinctly different than a person who lies about an affair. Now the lie does go to credibility."

The record contains a lengthy back and forth between the trial court, defense counsel, and the State. The trial court ruled that it would not admit evidence of the victim's extramarital affair "as reputation evidence, that somebody engaged in an affair." The court reserved its ruling on whether the evidence could be admitted for another purpose, stating, "whatever testimony unfolds throughout this case, we'll make a ruling as to the admissibility of any evidence or testimony associated with an affair."

The trial court, defense counsel, and the State then engaged in a discussion concerning the Chancery Court Order. A transcript of the chancery court hearing and the resulting Chancery Court Order is part of the record on appeal.[3] The State argued that admitting the Chancery Court Order, "specifically with the finding of credibility to the victim," would be "unfairly prejudicial" and that the chancellor's credibility findings were not relevant. The State pointed out that the chancellor was not aware of Defendant's text messages. The State concluded by arguing that had the chancellor "seen those text messages, his ruling would be different."

There is no written order pertaining to either motion in the record. The court concluded the hearing with its oral findings regarding the State's 412 motion relating to

---

[2] The context of the hearing transcript that is contained in the record on appeal indicates that the "sealed" hearing addressed Defendant's 412 motion only, although it is not entirely clear.

[3] A transcript of the September 1, 2020 Rutherford County Chancery Court hearing, [J.P.] v. Daniel Joseph Dreaden, Case No. 20cv-1366, was entered as an exhibit at Defendant's sentencing hearing. The September 22, 2020 Chancery Court Order was attached to Defendant's May 10, 2021 Motion to Reduce Bond.

the admissibility of "any allusion of an alleged affair of the victim, and any specific individual's opinion on the evidence or strength of the case" (Chancery Court Order):

> So, the [c]ourt would find that it's admissible as being prior testimony being found to not be truthful. And the [c]ourt does note this is not a credibility finding.
>
> As to the finding of the truthfulness or lack of truthfulness of the underlying allegations, the [c]ourt finds that it is too prejudicial to admit that in this proceeding. However, the [c]ourt would admit it under 608(b), that a witness testified untruthfully. Much akin to a prior finding of a conviction related to perjury.
>
> So, the [c]ourt would admit it as a prior judicial finding of untruthfulness in testifying in court, not lack of credibility. Untruthfulness.
>
> But as direct evidence by the Defendant, I agree with the State in that it's too prejudicial for the trier of fact. Because it -- it muddies the mind of the trier of fact to make their own conclusion. And the [c]ourt is certainly not going to allow the parties to call [the chancellor] to ask him why he found that. I don't think that helps any trier of fact.
>
> . . . .
>
> So, it's only admissible under 608(b) as a prior finding of testifying untruthfully in general, not as to these specific allegations.
>
> . . . . And even then, if it comes up, the [c]ourt – it's been admitted as an exhibit in a prior hearing, and the [c]ourt would intend that it be considered in this hearing as well. I'm not going to admit it as an exhibit, because it's already in the record. But it would not come in as substantive evidence as an exhibit in the trial. Because extrinsic evidence is not allowed under 608.

Nowhere in the transcript of the 412 hearing contained in the record on appeal did Defendant use the term "violation of confrontation clause."

The State, citing *State v. Vance*, 596 S.W.3d 229 (Tenn. 2020), argues that Defendant has waived the issue for failing to contemporaneously object. The State acknowledges that Defendant raised the confrontation clause issue in his motion for new trial; however, he did not assert it in his response to the State's motion in limine to exclude

- 8 -

evidence of the affair or during the hearing on the motion. In his response to the State's motion, Defendant argued that exclusion of the evidence "would violate [his] Fourteenth Amendment Due Process right to present a complete defense." In his reply brief to this Court, Defendant argues for plenary review and maintains that his argument in the trial court plainly encompassed the right to confront witnesses.

In *Vance*, our supreme court reiterated, "[A] party is bound by the ground asserted when making an objection to the admission of evidence and cannot assert a new or different theory to support the objection in the motion for new trial." *Id*. at 253 (citing *State v. Adkisson*, 899 S.W.626, 634-35 (Tenn. Crim. App. 1994)). The court clarified, "This rule applies when a party objects at trial based on a non-constitutional ground and then asserts a constitutional ground for the objection post-trial." *Id*. The court concluded that the defendant was "not entitled to plenary review of his constitutional issues." *Id*. at 253-254.

Defendant attempts to distinguish *Vance* on the basis that the defendant in *Vance* objected at trial on non-constitutional grounds and raised a confrontation clause violation in his motion for new trial and on appeal. Defendant, on the other hand, objected at trial on constitutional grounds, though not specifically confrontation clause grounds. Defendant contends his due process objection is sufficient to preserve the issue for plenary review.

To the extent Defendant argues that the distinction rests on the assertion of a non-constitutional basis at trial versus a constitutional basis in the motion for new trial, we disagree. The reasoning behind this waiver rule is so as not to fault the trial court for its ruling on an objection not specifically stated, whether constitutional or non-constitutional. *See Vance*, 596 S.W.3d at 253 ("A trial court cannot evaluate an objection that is not made."); *State v. Gardner*, No. M2022-01131-CCA-R3-CD, 2024 WL 4624804, at *31 (Tenn. Crim. App. Oct. 30, 2024) (declining to "place the trial court in error on an issue that it was never asked to consider or rule upon in the first instance), *perm. app. pending*. To the extent Defendant asserts that his due process right to present a defense encompasses his right to confront witnesses, we agree.

A defendant's "rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. at 295-96 (1973). As this Court observed in *State v. Allen*, "the rights guaranteed by the Confrontation Clause and the Due Process Clause are sometimes entwined, and the right of confrontation is sometimes subsumed by the right to due process." No. M2019-00667-CCA-R3-CD, 2020 WL 7252538, at *12 (Tenn. Crim. App. Dec. 10, 2020) (citing *Chambers*, 410 U.S. at 294 ("The rights to confront and cross-examine witnesses and to call witnesses on one's own behalf have long been recognized as essential to due process.")). Our supreme court has recognized that "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee

a criminal defendant the right to present a defense." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000).

We are mindful that parties must "endeavor to specifically state the issues raised so as to avoid any potential for future waiver." *Fahey v. Eldridge*, 46 S.W.3d 138, 143 (Tenn. 2001). Defendant, with his response to the State's 412 motion, his own 412 Motion, his argument at the 412 hearing, his motion for new trial with supporting memorandum, and his reply brief responding to the State's waiver argument in this Court, appropriately preserved his confrontation issue for appellate purposes. *See State v. Bowers*, No. M2022-00949-CCA-R3-CD, 2023 WL 6211909 (Tenn. Crim. App. Sept. 21, 2023), *perm. app. denied* (Tenn. May 17, 2024). The context of the proceedings and the entire record before us makes clear that Defendant was objecting to the prohibition of confronting the victim with evidence of her alleged affair, and thus present his theory of a defense.

Accordingly, because Defendant's right to present a defense necessarily includes his right to confront his accuser, and because Defendant sufficiently preserved the issue, we conclude that Defendant has not waived plenary review of this issue. We will therefore consider whether Defendant was denied his right to confrontation.

In order to show a violation of his right to confrontation, Defendant must demonstrate that "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury facts from which the jurors could appropriately draw inferences relating to the reliability of witnesses." *State v. Black*, 815 S.W.2d 166, 177 (Tenn. 1991) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). Defendant "must show that a reasonable jury might have received a significantly different impression of the witness's credibility had counsel been permitted to pursue his proposed line of cross-examination." *Id*. (citing *Van Arsdall*, 475 U.S. at 680).

The Tennessee Rules of Evidence establish specific guidelines for admitting evidence of a victim's sexual behavior. Specifically, Rule 412 governs the admissibility of evidence about a sex crime victim's prior sexual conduct. Subsection (c) governs the admissibility of specific instances of conduct and states, in relevant part, as follows:

> Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
>
> (1) Required by the Tennessee or United States Constitution, or

(2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim[.]

(3) If the sexual behavior was with the accused, on the issue of consent, or

(4) If the sexual behavior was with persons other than the accused,

   (i) to rebut or explain scientific or medical evidence, or
   (ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
   (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c). It is a rule of relevance, *see Brown*, 29 S.W.3d at 430, and we will not overturn a trial court's Rule 412 ruling absent an abuse of discretion. *State v. Sheline*, 955 S.W.2d 42, 46 (Tenn. 1997). "If the court determines that the evidence which the accused seeks to offer satisfies subdivisions (b) or (c)" of the rule, then the court must decide whether the probative value of the evidence outweighs the risk of unfair prejudice to the victim. Tenn. R. Evid. 412(d)(4). "[T]he evidence shall be admissible in the proceeding to the extent an order made by the court specifies the evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined." *Id*.

In *Olden v. Kentucky*, 488 U.S. 227 (1988) (per curiam), the defendant, charged with kidnapping, rape, and forcible sodomy, claimed that he and the victim had several consensual sexual encounters after a night at a bar. The defendant dropped off the victim "in the vicinity" of the home of a man with whom the victim was having an extramarital affair at the time of the incident. *Id*. at 229. The boyfriend testified that he saw the victim get out of the defendant's car, and the victim immediately told him she had been kidnapped and raped by the defendant and a co-defendant. *Id*. The defendant's theory of the case was that the victim "concocted the rape story to protect her relationship with [her boyfriend], who would have grown suspicious upon seeing her disembark from [the co-defendant's] car." *Id*. at 230. The defendant sought to introduce evidence of the victim's and her boyfriend's cohabitation at the time of trial, which the trial court excluded, even after the victim testified on direct examination that she was living with her mother. *Id*. Although

- 11 -

not barred by the state rape-shield statute, the Kentucky Court of Appeals upheld the exclusion of the cohabitation evidence based on the potential for racial prejudice because the victim was white, and her boyfriend was black. *Id*. at 230-31. The United States Supreme Court reversed and held that the trial court's exclusion of the evidence violated the defendant's right to confront witnesses. The Court held, "[i]t is plain to us that '[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination.'" *Id*. (quoting *Van Arsdall*, 475 U.S. at 680).

Defendant asserts that "[t]he same is true here" and that he should have been allowed to cross-examine J.P. "regarding her extra-marital relationship . . . to explore her motive to fabricate the alleged rape." Defendant suggests that J.P. was motivated to lie about the rape in order to protect her extramarital relationship. He argues that evidence of J.P.'s affair would have permitted the jury to infer that she consented to having sex with Defendant.

While similar in some respects, we agree with the State that *Olden* is factually distinguishable from this case. Defendant, like in *Olden*, claimed a defense of consent. In *Olden*, the defendant "consistently asserted that he and [the victim] engaged in consensual sexual acts and that [the victim]—out of fear of jeopardizing her relationship with [her boyfriend]—lied when she told [her boyfriend] she had been raped and has continued to lie since." *Id*. at 232. Here, there is no clear evidence in the record that supports a compelling reason for J.P. to have fabricated a non-consensual sexual encounter with her then husband to protect her relationship with her boyfriend. The excluded evidence in this case would not have had "such strong potential to demonstrate the falsity" of J.P.'s testimony because, unlike the victim in *Olden*, J.P. did not immediately make a rape allegation after being seen by her boyfriend exiting another man's car. *See id*. at 232. Undisputedly J.P. instead confronted Defendant upon waking up with signs of sexual activity having occurred.

Other than to suggest generally that J.P.'s extramarital affair provided motive to lie about the rape, Defendant does not explain how the rape allegation would serve to protect her relationship with her boyfriend. The impeachment value of the evidence here is significantly less than in *Olden*. It is not clear from the record the purpose for which Defendant wanted to introduce proof of the affair. At the 412 hearing on the State's motion to exclude evidence of the affair, defense counsel asserted it was admissible to show that J.P. "lie[d] about an affair."[4] Defendant did not present an offer of proof at the hearing. *See* Tenn. R. Evid. 103(a)(2) (requiring the party seeking admission of evidence to make

---

[4] Defendant does not challenge the trial court's ruling with regard to the Chancery Court Order in this appeal.

an offer of proof unless the substance of the evidence and the evidentiary basis supporting the evidence's admission is apparent under the circumstances).  Such offer of proof might have established whether J.P.'s extramarital relationship began before the alleged rape occurred.  At the hearing, the trial court asked, "[I]s there any proof associated with the allegations of an affair that the parties would like to proffer to determine – for the [c]ourt to determine admissibility of it, or is there a stipulation – or you tell me."  Defense counsel responded, "No proof as it would relate to 412."

After hearing the arguments of counsel, the trial court determined that evidence of an affair was not admissible "as reputation evidence," but the court reserved its ruling on whether the evidence could be admitted for another purpose, stating, "whatever testimony unfolds throughout this case, we'll make a ruling as to the admissibility of any evidence or testimony associated with an affair."  Significant to our review, questions regarding the alleged affair issue were not addressed to any witness during trial.

During Defendant's direct examination at trial of Detective Butler, who was offered as both a fact and an expert witness, Defendant made a proffer regarding the detective's knowledge of the Chancery Court Order.  She was asked how such knowledge impacted her investigation of an alleged crime of rape by Defendant.  She stated the Chancery Court Order was an "obstacle" but it did not stop her from proceeding to assist the victim in presenting the case to the grand jury.  No questions were asked of Detective Butler about the alleged affair.

After hearing the proffer, the trial court stated that it stood by its previous ruling regarding the Chancery Court Order, and "the proffered testimony just elicited should be excluded from the trial."

Based on the record before us, we conclude that the trial court's ruling did not violate Defendant's confrontation rights primarily because the record does not reveal what the evidence would have shown or how it would have adversely impacted J.P.'s credibility.  Furthermore, to the extent Defendant's confrontation violation claim is pertaining to the Chancery Court Order, the order invaded the duties of the trier of fact, its unfair prejudice to the victim outweighed its probative value, and it was not relevant.

After plenary review, we conclude the Defendant is not entitled to relief on his claim of a violation of his "constitutional right of confrontation by prohibiting him from cross-examining [J.P.] about her extra-marital affair to establish her motivation to fabricate the allegation of rape."

*Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to establish rape. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. Appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

In a bench trial, the trial judge, as the trier of fact, must resolve all questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). The trial judge's verdict carries the same weight as a jury verdict. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978); *see also State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999). "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As applicable in this case, rape is the "unlawful sexual penetration of a victim by the defendant," if either the "sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent," or if "[t]he defendant knows or has reason to know that he victim is: [m]entally defective[,] [m]entally incapacitated[, or] physically helpless[.]" T.C.A. § 39-13-503(a)(2), (3). The term "sexual penetration" means "sexual intercourse . . . or any other intrusion, however slight, of any part of aa person's body . . . into the genital or anal openings of the victim's . . . body." *Id*. § 39-13-501(7).

The parties do not dispute that Defendant penetrated J.P. Defendant argues that the evidence was insufficient to establish rape because J.P. "admitted that she may have engaged in arousing behavior, leading [Defendant] to believe that she consented to sexual intercourse." The State asserts that Defendant knew or had reason to know that J.P. did not consent. This assertion is supported by evidence at trial by both J.P. and Defendant.

The proof at trial, viewed in the light most favorable to the State, showed that in September of 2019, J.P. told Defendant that she wanted to divorce him. From September

to December, J.P. intermittently stayed at the marital home with Defendant and their children and continued to participate in certain family activities. On the night in question, J.P. and Defendant were sitting together watching television, and Defendant asked J.P. if she wanted to have sex. J.P. replied, "No." She took a Benadryl, had a vodka drink, and went to bed. At some point, Defendant got in bed with her and sexually penetrated her while J.P. was sleeping. The next morning, J.P. confronted Defendant, and he denied having sex with J.P. Defendant later "admitted" that he penetrated her. Defendant interpreted J.P.'s behavior, "grinding" on him while they were on the couch and "spooning" in bed, as an indication that she consented to sex. J.P. admitted it was possible she had "grinded" on Defendant that night. According to Ms. Mitchell, Defendant called her to admit that he had intercourse with J.P. while J.P. was sleeping, and Defendant was "sobbing" when he admitted what he had done. In his text messages to Mr. Nowicki, Defendant said he wanted J.P. "to wake up and turn and kiss [him]." He told Mr. Nowicki it was his desire to "wake her up, and we would fall into each other's arms and be man and wife." Defendant attempted to "provide[] clarity" for his text messages by explaining that he wanted J.P. to be more passionate toward him and he wanted to remain married. However, the trial court found Defendant was not credible, and the court had "a difficult time accepting" Defendant's explanation.

J.P. denied consent when she told Defendant that she did not want to have sex. Defendant's theory is that she subsequently gave implicit consent through her body language, but Defendant's actions and admissions — first in denying to J.P. that he had done anything and subsequently in acknowledging to others that J.P. was asleep and unable to give consent — provide evidence from which a reasonable trier of fact could have found Defendant knew she did not consent. We will not reweigh the evidence. The evidence was sufficient to support Defendant's conviction. Defendant is not entitled to relief on this issue.

Finally, we note that the record does not contain a judgment for Count 3 of the indictment, which charged Defendant with rape by force or coercion. *See* T.C.A. § 39-13-503(a)(1). An Order of Dismissal reflects that the count was dismissed by motion of the State. However, a judgment should be entered reflecting that the charge was dismissed. *See* Tenn. R. Crim. P. 32(e)(3) ("If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall enter judgment accordingly."); *State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) (order) ("For charges resulting in a not guilty verdict or a dismissal, the trial court should "enter judgment accordingly" as to the respective count.").

CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed, but the case is remanded for entry of a judgment form in Count 3 to reflect dismissal of that count.

s/Timothy L. Easter
TIMOTHY L. EASTER, JUDGE